UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YOOMI BABYTECH, INC.,

    Plaintiff

v.

ANVYL, INC., RODNEY MANZO,
VITALPURE, LLC, and FEEL WELL, LLC,

   Defendants

SVB FINANCIAL GROUP and
JPMORGAN CHASE BANK, N.A.,

   Trustee Process Defendants

**COMPLAINT**

Case No. _____

The plaintiff, Yoomi Babytech, Inc. ("Yoomi"), brings this Complaint against the

defendants, Anvyl, Inc. ("Anvyl"), Rodney Manzo ("Manzo"), VitalPure, LLC ("VitalPure") and

Feel Well, LLC ("Feel Well") upon the facts and claims set forth below.

## PARTIES

1.    The Plaintiff, Yoomi, is a Canadian company with a principal place of business at

1 Yonge Street, Suite 1801, Toronto, Ontario, Canada, M5E 1W7.

2.    Defendant Anvyl is a New York Corporation with a corporate address of 335

Madison Avenue, Suite 6H, New York, NY 10017.

3.    Upon information and belief, defendant Manzo is a natural person residing or

doing business in New York with an address of 335 Madison Avenue, Suite 6H, New York, NY

10017.

4.    Upon information and belief, defendant VitalPure is a Utah limited liability

company with a registered address at 5911 Fashion Boulevard, Salt Lake City, UT 84107 and a

principal place of business at 2104B Memorial Boulevard, Kerrville, TX 78028.

5.      Upon information and belief, defendant Feel Well is a Utah Limited Liability Company with a corporate address of 7880 South 1300 West, West Jordan, UT 84088.

6.      Trustee Process Defendant SVB Financial Group is a nationwide bank doing business as Silicon Valley Bank ("Silicon Valley Bank") with offices in New York at 387 Park Avenue South, 2nd Floor, New York, NY 10016.

7.      Trustee Process Defendant JPMorgan Chase Bank, N.A. ("Chase Bank") is the banking subsidiary of JPMorgan Chase & Co. with U.S. Branches in 38 states and with a corporate address of 383 Madison Avenue, New York, NY 10179-0001.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action based upon complete diversity of citizenship between plaintiff and defendants, and the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332(a). Further, upon information and belief all defendants are actively doing business in New York, conducting financial transactions in New York, and receiving funds from entities in New York. In addition, this case arises out of a contract between Yoomi and Anvyl which provides for jurisdiction in State and Federal Courts in New York, and the harm to Yoomi caused by VitalPure and Feel Well arises directly out of that contract.

9.      Venue is proper in this case pursuant to 18 U.S.C. §1391 and §1965 because upon information and belief at all times relevant hereto the defendants conducted continuous and systematic business in New York, and a substantial portion of the acts and omissions referenced below took place in, or were direct from, this judicial district.

## FACTS

### A.    The Contract for 120,000,000 Bottles of Hand Sanitizer

10.    Yoomi is the successor in interest to Yoomi Limited UK which was founded in 2010 by an engineer who holds 17 patents for innovative self-warming baby bottle technology. Yoomi's products are currently sold in 24 countries and is the winner of over 50 international awards for quality and innovation. Yoomi enjoys a reputation for quality household products.

11.    Yoomi formed profitable relationships with several large retailers in the United States for the sale of bottles of consumer-use hand sanitizer.

12.    Yoomi developed a relationship with Albertsons Companies, LLC ("Albertsons"). Albertsons has over 2,200 stores and is the second largest grocery store chain in United States with annual revenues of over $60,000,000,000. The company's divisions and subsidiaries operate stores under the names of Albertsons, Safeway, Acme, Bristol Farms, Grocery Warehouse, Jewel, Jewel-Osco, Max Foods, Osco Drug, Shaw's, Star Market and Super Saver.

13.    Yoomi also developed a relationship with Becton, Dickinson and Company ("BD"), a global technology company with revenues of over $17,000,000,000 that seeks to improve the delivery of medical care.

14.    Yoomi was in need of a supply chain company that could manage the production and delivery of very large volumes of hand sanitizer.

15.    Yoomi discussed those needs with Anvyl and its Chief Executive Officer, Manzo.

16.    Yoomi informed Manzo and Anvyl that it would require 5,000,000 bottles of 8-ounce sanitizer and 5,000,000 of 16-ounce sanitizer per month, which equals 120,000,000 bottles per year.

17.    Yoomi further made clear to Anvyl and Manzo that in dealing with very large

3

orders, production quality, timeliness of shipments, and a reliable ongoing supply of product were of paramount importance. Yoomi made clear that failure to deliver quality product on time could result in a cancellation of all future purchase orders.

18.     Yoomi also informed Anvyl and Manzo that it needed a warranty that the sanitizer would be free from material defects and would conform with all requirements to enable the product to be sold freely throughout the U.S. market.

19.     Manzo assured Yoomi that Anvyl was very experienced as a high-quality turnkey supply chain solution, and was able to deliver to Yoomi under these specifications at the high volume Yoomi required on an on-going basis.

20.     Manzo represented to Yoomi that Anvyl was able to handle the entire supply chain process from the sourcing of the sanitizer, bottles, caps, labels and trays, and the production, filling, capping, labeling, boxing and palletizing of the product.

21.     Manzo also assured Yoomi that Anvyl would warrant that the sanitizer would be free from material defects and would confirm to applicable specifications and valid FDA certifications, and would meet all regulations to freely sell the product in the U.S. market.

22.     In reliance on these representations, on or about May 10, 2020 Yoomi and Anvyl entered into a Hand Sanitizer Gel 70% Alcohol Supply Agreement ("Agreement"). Manzo signed the Agreement on behalf of Anvyl.

23.     The Agreement states, in relevant part: "[Anvyl] agrees that a reliable ongoing supply of Products is of critical importance to YB." Agreement, par. 4. The Agreement also contains a Warranty: "**Warranty.** AI warrants that the Products will be free from material defects, will conform within normal commercial tolerances, to the applicable specifications, valid FDA certification and meet all statutory regulations that enables the Products to be sold

freely in the US market." Id., par. 9.

24.     The Agreement also contained a mockup photograph of standard, colorless hand sanitizer gel, so that Yoomi could confirm the appearance of the final product it would receive. Id., Schedule A.

**B.      Anvyl and VitalPure Failed in the Albertsons Order**

25.     Yoomi provided Anvyl its first purchase order, which was placed by Albertsons through Yoomi's business affiliates, Cohen Friedberg and Associates, LLC and SB360 Capital Partners, LLC, for 1,032,192 16oz. bottles of hand sanitizer. This amount of product would fill 28 trucks. The total production cost for Yoomi was $2,601,123.84 and the sales price was $3,922,330, for a projected profit of $1,321,206.

26.     Yoomi also provided Anvyl its second purchase order, which was an order placed by BD for 35,328 16oz. bottles of hand sanitizer.

27.     Yoomi paid Anvyl $2,146,466.83 pursuant to the Agreement.

28.     On or about May 15, 2020, Anvyl informed Yoomi that it wanted to switch the bottling facility for the product to VitalPure. Upon information and belief, VitalPure is a subsidiary or division of Feel Well, and the sanitizer itself is produced by Feel Well.

29.     Anvyl assured Yoomi that it knew that this company produces for very large customers such as Home Depot and the State of California.

30.     Anvyl e-mailed Yoomi a picture of what VitalPure's final product would look like, in order to induce it to agree to the switch in manufacturers.

31.     Prior to the recommendation by Anvyl, Yoomi had never heard of VitalPure or Feel Well, and had never spoken with either company.

32.     Yoomi relied on the recommendation of Anvyl, as it was the expert in supply-side

production.

33.     Unfortunately, Anvyl, VitalPure and Feel Well failed in their work in nearly every respect.

34.     First, Anvyl failed to order proper labels. This caused delays in production.

35.     Anvyl also failed to timely source appropriate bottlecaps. The caps Anvyl sourced were late in arriving to VitalPure and were designed for sports drinks, not hand sanitizer.

36.     Anvyl also failed to order the correct trays, which caused further delays.

37.     Further, Yoomi had paid Anvyl $7,000 to hire an FDA consultant to obtain a National Drug Code number and to register it with the FDA. However, Anvyl failed to do this on a timely basis, which caused further delays.

38.     When production started, VitalPure understaffed the Yoomi project, causing further delays.

39.     Further, Feel Well's sanitizer formula was too thick to properly flow through VitalPure's filling nozzles, which caused yet further delays.

40.     Further, VitalPure packed the sanitizer with the wrong number of bottles per box. The Albertsons order required 32 bottles per box—as Anvyl and VitalPure knew—but they packed only 24 bottles per box.

41.     All of these problems caused delays. Anvyl and VitalPure assured Yoomi that 28 truckloads of hand sanitizer would start to ship by May 28, 2020. They failed to meet that deadline. Anvyl and VitalPure then pushed out the start date to June 1, 2020. They failed to meet that deadline also. Each extension caused Albertsons to become increasingly frustrated.

42.     *Every bottle* of the Yoomi product produced under the turnkey auspices of Anvyl, and by extension VitalPure, was delivered late to Albertsons. Albertsons received the sanitizer

bottles at five major distribution centers and then delivered them to most or all of its 2,200 stores.

43.     On June 2, 2020, Yoomi informed Anvyl that it anticipated purchase orders from Staples for over 3,000,000 bottles and additional sales to 7-Eleven and Lowes. Anvyl continued to assure Yoomi that it was on track to handle all of the supply side production for all of Yoomi's orders, and apologized for its prior failures on the Albertsons order: "I know the initial experience has not been what you expected.  I apologize for that…. I am confident we can easily produce 4-5 million units/month.  We have multiple sites at our disposal outside of the TX plants."

44.     After delivery, Albertsons did an inspection of the product and found that a large number of bottles of the sanitizer were of a sickly yellow color. The bottles varied in color from light to dark. The sanitizer also had a strange odor beyond merely the alcohol scent.

45.     VitalPure inspected the samples and, on June 29, 2020, agreed that the product had turned yellow.

46.     Albertsons informed its entire fleet of 2,200 stores to remove all yellowed Yoomi products from their shelves. This totaled 212,113 bottles. Albertsons also recalled and rejected 324,352 bottles of Yoomi product that had not yet been distributed to its stores. All yellow product needed to be discarded and the balance of the products needed to be date coded, re-boxed and reinspected.

47.     The cost to recall the Albertsons order was $806,029.40, and the lost value of the bottles returned from Albertsons was $1,232,537.60, having a total impact loss of $2,038,567.

48.     Yoomi immediately brought this to the attention to Anvyl, but Anvyl refused to participate in the recall efforts in order to salvage the deteriorating relationships. Anvyl failed to

take ownership of this problem or take any meaningful steps to rectify it on a timely basis.

49.     After Anvyl and VitalPure were given numerous opportunities to resolve these issues, Albertsons canceled the final 8 truck deliveries under the first purchase orders which contained 36,864 bottles each for a total of 294,912 bottles. The loss of sales for this initial tranche of sales alone was $1,120,666.

50.     The recall of the yellowed and late-delivered bottles ruined Yoomi's relationship with Albertsons and with its product broker. Albertsons cancelled all future purchase orders from Yoomi and has refused to order further products from Yoomi.

51.     In sum, Anvyl and VitalPure had delivered only 70% of the initial Albertsons order and, as set forth above, *each* bottle was delivered late, they each had the wrong caps, many of the boxes had incorrect numbers per box, and hundreds of thousands of bottles were yellow.

**C.     Anvyl Failed in the BD Order**

52.     In light of the problems with VitalPure and Feel Well, for the BD order Anvyl switched the production to a facility in Illinois called Fareva USA, Inc. ("Fareva").

53.     When production started in Illinois, however, it appears that Anvyl changed the formula of the sanitizer. This resulted in additional delays and a label change. But Anvyl again failed to source proper labels for this revised formula. Accordingly, Yoomi was once again compelled to source its own labels. Further still, Anvyl had not sourced the bottles and caps to be ready for production in Illinois.

54.     Accordingly, all of the 35,328 bottles were delivered late to BD.

55.     Foreseeably, BD cancelled all future purchase orders from Yoomi, thus ruining that relationship as well.

56.     Because Yoomi lost two extremely large customers, the business broker refused

to continue to work with Yoomi and would not place orders with Lowes, 7-Eleven or Staples. Yoomi's entire expected 120,000,000 annual business was ruined.

**D.**      **Damages and Reliance**

57.      As set forth in the contract, in the first year Yoomi expected to sell 60,000,000 8oz. bottles and 60,000,000 16oz. bottles. The gross margin to Yoomi was $0.89 for each 8oz. bottle and $1.28 on each 16oz. bottles. The contract damages to Yoomi for the first year alone was, therefore, $130,200,000.

58.      But Anvyl, VitalPure and Feel Well failed in their obligations in nearly every way possible. Without limitation:

A.   Anvyl, VitalPure and Feel Well failed to produce good quality and merchantable product;
B.   Anvyl, VitalPure and Feel Well failed to produce product which met the reasonable specifications of Yoomi and its customers;
C.   Anvyl failed to source the correct bottles, caps and labels;
D.   Anvyl and VitalPure failed to box the product correctly;
E.   Anvyl failed to obtain FDA approval on a timely basis;
F.   Anvyl and VitalPure failed to produce product on time even after deadlines were extended;
G.   Anvyl failed to manage the financial resources entrusted to them;
H.   Anvyl failed to manage its subvendors and subcontractors; and
I.   Anvyl, VitalPure and Feel Well failed to properly fix the problems once they were identified, which could have helped to salvage the relationships. In a genuine and material way, each defendant defrauded Yoomi because collectively they represented to Yoomi that they would be competent to handle each of these necessary and critical tasks but clearly they were not.

59.      Anvyl actively led Yoomi to believe that it was competent to undertake the supply chain management of the annual 120,000,000 bottle production project, when it knew or should have known that it was not as it failed in nearly every material respect and could not do anything competently, as set forth above. These representations were knowingly untrue when made, as Anvyl knew it was unable to adequately handle the production, bottling and boxing of the product.

60.     Further, Anvyl actively led Yoomi to believe that it knew that VitalPure was a competent production facility when it had no good-faith grounds on which to make this claim, and indeed had never worked with them in the past.

61.     Further, Anvyl falsely informed Yoomi that VitalPure and Feel Well produced for very large buyers such as Home Depot, but upon information and belief they were only tangentially and infrequently involved in production for Home Depot.

62.     These statements were made on various dates including May 4 and 8, 2020 via telephone. These representations were made by Manzo, in his capacity as Chief Executive Officer of Anvyl and for his own benefit. Additional statements were made by Will Davis of Anvyl, particularly the statements made on May 15, 2020 recommending VitalPure.

63.     VitalPure led Yoomi to believe that it was competent to undertake the production, filling, capping, labeling, boxing and palletizing of the project in a competent manner, when it knew or should have known that it was not as it failed in nearly every material respect, as set forth above. These representations by VitalPure were made through its acceptance of the purchase orders and Yoomi's money. These statements were made in Junction, TX and various places in Utah on various dates including May 15, 2020 and subsequent dates in May and June, 2020. They were made by two of the owners and managers of VitalPure and Feel Well, Kent A. Hoggan ("Hoggan") and Owen B. Kenney ("Kenney").

64.     The obvious and direct effect of all of these failures was eminently foreseeable: Yoomi lost its hand sanitizer business, it lost trust with its brokers, and its reputation was substantially damaged.

65.     On May 22, 2020, Yoomi entered into a Letter of Intent with Fareva for its production of a minimum of 3,000,000 8oz bottles through July 31, 2020 for $2,100,000 in

production costs plus $1,060,265.80 in alcohol costs. Due to the defendants' failures set forth above, Yoomi lost all of its purchase orders and Anvyl has alleged that Yoomi owes Fareva $3,160,265.80. The defendants should be obligated to pay the $3,160,265.80 as it was their failures which directly caused the loss of purchase orders.

66.     If at any point Anvyl and/or VitalPure had been honest with Yoomi, they would have informed Yoomi that they were not capable of producing a reliable product, properly bottled and boxed, and that Yoomi should find another supply chain solution. However, they continued to assure Yoomi that all of the problems were being immediately rectified. This reliance by Yoomi caused further harm and prevented Yoomi from salvaging these lucrative customer relationships.

67.     Loss of purchase orders from Albertsons resulted in direct foreseeable loss of access to its 2,200 stores nation-wide, and direct loss of purchase orders from other retailers in the same networks.

68.     All of the conduct of Manzo as set forth herein was done on his own behalf and as an employee, agent and servant of Anvyl.

69.     All of the conduct of VitalPure as set forth herein was done on its own behalf and under the direction, supervision, oversight and control of Feel Well, and for the benefit of Feel Well.

70.     Upon information and belief, VitalPure is actively engaged in business in New York because it regularly does business with New York entities, it receives money for orders which are placed in New York, and it ships products through interstate commerce to New York.

71.     Upon further information and belief, Hoggan and Kenney have failed to properly capitalize and insure VitalPure and Feel Well.

Case 1:20-cv-07933-ER   Document 1   Filed 09/25/20   Page 12 of 20


72.     Upon information and belief, there is insufficient or no insurance to defend or indemnify the defendants for the damages Yoomi is likely to recover in this action.

73.     Upon information and belief, Silicon Valley Bank is holding cash for Anvyl and possibly Manzo, and those funds are available to Anvyl upon demand.

74.     Upon information and belief, Chase Bank is holding cash for VitalPure and Feel Well and those funds are available to VitalPure and Feel Well upon demand.

<u>COUNT I</u>
<u>BREACH OF CONTRACT AND THE IMPLIED COVENANTS</u>
<u>OF GOOD FAITH AND FAIR DEALING</u>

75.     Yoomi realleges and incorporates by reference all paragraphs above as if specifically set forth herein.

76.     Yoomi duly performed all conditions in the agreements between the parties on its part required to be performed.

77.     Anvyl, VitalPure and Feel Well materially breached their contracts with Yoomi by failing to properly manufacture, produce, bottle, cap, label, box, palletize and timely deliver sanitizer product which was of good and merchantable quality and within the specifications required, as set forth above. Further, Anvyl failed to properly provide a competent and quality turnkey supply-chain production, as promised, and failed to honor its warranty.

78.     The defendants also breached the covenants of good faith and fair dealings implied in said contracts.

79.     As a result of these breaches of contract, Yoomi has suffered substantial damages as hereinbefore alleged and demands compensation therefor. Yoomi lost $2,146,466.83 in out-of-pocket payments, it has a potential liabilities of $3,160,265.80, and it lost $130,000,000 in contract damages.

## COUNT II
## NEGLIGENCE

80.     Yoomi realleges and incorporates by reference all paragraphs above as if specifically set forth herein.

81.     The defendants had a duty to exercise reasonable skill, prudence and judgment in its services performed on behalf of Yoomi.

82.     Each defendant breached those duties of care as set forth above.

83.     As a direct and proximate result of the defendants' negligence, Yoomi has suffered substantial damages as hereinbefore alleged and demands compensation therefor. Yoomi lost $2,146,466.83 in out-of-pocket payments, it has a potential liabilities of $3,160,265.80, and it lost $130,000,000 in contract damages.

## COUNT III
## GROSS NEGLIGENCE

84.     Yoomi realleges and incorporates by reference all paragraphs above as if specifically set forth herein.

85.     Under New York Law, gross negligence is conduct that evinces reckless disregard for the rights of others or "smacks" of intentional wrongdoing. *See* Colnagi, U.S.A., Inc. v. Jewelers Protection Services, 611 N.E.2d 282 (N.Y. 1993). Gross negligence means a failure to use even slight care, or conduct that is so careless as to show complete disregard for the rights of others. See New York Pattern Jury Instruction 2:10 (PJI 2:10). The question of gross negligence is a matter to be determined by the trier of fact. Food Pageant v Consolidated Edison Co., 54 NY2d 167, 172-173, 429 NE2d 738, 445 NYS2d 60 (1981); Dolphin Holdings, Ltd. v Gander & White Shipping, Inc., 122 A.D.3d 901, 902, 998 N.Y.S.2d 107, 109 (App. Div. 2014).

86.     The conduct of the defendants herein satisfies these elements. The defendants

collectively acted with reckless disregard of the rights of Yoomi. Yoomi paid $2,146,466.83 to the defendants. The defendants delivered hundreds of thousands of bottles of yellowed hand sanitizer, and all bottles were delivered substantially late. Further, upon information and belief Anvyl had never worked with VitalPure but nonetheless advised Yoomi to have VitalPure undertake their entire production line.

87.     As a result of the defendants' gross negligence, Yoomi has suffered substantial damages as hereinbefore alleged and demands compensation therefor. Yoomi lost $2,146,466.83 in out-of-pocket payments, it has a potential liabilities of $3,160,265.80, and it lost $130,000,000 in contract damages.

## COUNT IV
## NEGLIGENT MISREPRESENTATIONS

88.     Yoomi realleges and incorporates by reference all paragraphs above as if specifically set forth herein.

89.     Anvyl misled Yoomi to believe that it would provide high quality and competent supply-chain management, when it knew or should have known that this was not true.

90.     VitalPure and Feel Well misled Yoomi to believe that they would deliver good quality product on time, when they knew or should have known that this was not true.

91.     Yoomi reasonably relied upon those representations to its detriment.

92.     Yoomi has suffered substantial damages as hereinbefore alleged and demands compensation therefor. Yoomi lost $2,146,466.83 in out-of-pocket payments, it has a potential liabilities of $3,160,265.80, and it lost $130,000,000 in contract damages.

## COUNT V
## FRAUD

93.     Yoomi realleges and incorporates by reference all paragraphs above as if

14

specifically set forth herein.

94.     The elements of a cause of action for fraud are (1) the false representation or concealment of a material existing fact, (2) scienter, (3) deception, (4) reliance, and (5) injury. House of Spices (India), Inc. v SMJ Servs., Inc., 2011 N.Y. Misc. LEXIS 1922 (N.Y. Misc. 2011 ). Each of these elements are supported by factual allegations set forth above.

95.     Anvyl and Manzo made the false statements and representations that Anvyl was competent to undertake the supply chain management of the annual 120,000,000 bottle production project, when they knew or should have known that Anvyl simply was not. They knew or should have known that Anvyl was not because Anvyl was so completely incompetent to undertake this large task that it could not have been unknown to them.

96.     Further, Anvyl actively led Yoomi to believe that VitalPure was a competent production facility when it knew it had no good-faith grounds on which to claim that this was the case. Anvyl falsely informed Yoomi that VitalPure and Feel Well produced for very large buyers such as Home Depot, but upon information and belief they were only tangentially and infrequently involved in production for that large customer. Upon information and belief Anvyl had never worked with VitalPure but nonetheless assured Yoomi that VitalPure was competent to undertake their entire production line.

97.     These representations were knowingly untrue when made.

98.     Yoomi was deceived thereby, and relied on the false statements by entrusting Anvyl with its entire supply-side production.

99.     These statements were made on various dates including May 4, 8 and 10, 2020 via telephone. These representations were made by Manzo, in his capacity as Chief Executive Officer of Anvyl and for his own benefit, and also by Mr. Will Davis, a production manager at

Anvyl.

100.    VitalPure led Yoomi to believe that it was competent to undertake the production, filling, capping, labeling, boxing and palletizing of the bottles, when it knew or should have known that it was not as it failed in nearly every material respect, as set forth above. VitalPure, concealed that material fact from Yoomi. These concealments and tacit representations were made through its acceptance of the purchase orders and Yoomi's money, and Kenney and Hoggan's promises that they would undertake the necessary work in a competent manner.

101.    These representations were knowingly untrue when made, and the concealments were undertaken knowing that Yoomi would rely thereupon to its detriment. Yoomi was deceived thereby, and relied on the false statements and concealments by entrusting VitalPure with its production.

102.    These statements were made in Junction, TX and various places in Utah on various dates including May 15, 2020 and subsequent dates in May and June, 2020.

103.    Feel Well led Yoomi to believe that it was competent to produce the sanitizer in a good, salable and commercially marketable way, when it knew or should have known that it was not as it failed to deliver colorless sanitizer as Yoomi required. Feel Well and Hoggan concealed that material existing fact from Yoomi.

104.    These concealments and tacit representations were made through Feel Well's acceptance of the money and purchase orders from Yoomi.

105.    These representations were knowingly untrue when made, and the concealments were undertaken knowing that Yoomi would rely thereupon to its detriment.

106.    Yoomi was deceived thereby, and relied on the false statements and concealments by entrusting Feel Well to produce quality sanitizer.

16

107.    These statements were made in Junction, TX and various places in Utah on various dates including May 15, 2020 and subsequent dates in May and June, 2020.

108.    The obvious and direct effect of all of these failures was eminently foreseeable: Yoomi lost its hand sanitizer business, it lost trust with its brokers, and its reputation was substantially damaged. As a result of the defendants' fraud, Yoomi has suffered substantial damages as hereinbefore alleged and demands compensation therefor.

109.    If at any point any of the defendants had been honest with Yoomi, they would have informed Yoomi that they were not capable of producing a reliable product, properly bottled, boxed and palletized, and that Yoomi should find another supply chain and manufacturing solution. However, they continued to assure Yoomi that all of the problems were being immediately rectified. This reliance by Yoomi caused further harm and prevented Yoomi from salvaging these lucrative customer relationships.

110.    The fraudulent statements made by Anvyl were made by Manzo. The fraudulent statements made by VitalPure and Feel Well were made by Hoggan and Kenney.

## COUNT VI
## FRAUD IN THE INDUCEMENT

111.    Yoomi realleges and incorporates by reference all paragraphs above as if specifically set forth herein.

112.    The elements of fraudulent inducement are: (1) a false representation of material fact; (2) known by the utterer to be untrue; (3) made with the intention of inducing reliance and forbearance from further inquiry; (4) that is justifiably relied upon; and (5) resulting in damages. MBIA Ins. Corp. v. Credit Suisse Securities USA LLC, 32 Misc. 3d 758, 927 N.Y.S.2d 517 (2011). Each of these elements are supported by factual allegations set forth above.

113.    Yoomi incorporates the facts and analysis set forth in the Fraud Count (Count V)

above.

114.     The fraudulent conduct of the defendants as set forth above was undertaken with the intention of inducing reliance and forbearance from further inquiry by Yoomi, which was justifiably relied upon by Yoomi as set forth above. As a result of the defendants' fraudulent inducement, Yoomi has suffered substantial damages as hereinbefore alleged and demands compensation therefor. Yoomi lost $2,146,466.83 in out-of-pocket payments, it has a potential liabilities of $3,160,265.80, and it lost $130,000,000 in contract damages.

## COUNT VII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE OR ECONOMIC RELATIONS

115.     Yoomi realleges and incorporates by reference all paragraphs above as if specifically set forth herein.

116.     As set forth above, Yoomi had business relations and prospective economic advantages with its brokers, investors, customers and potential customers. The defendants knew of those relationships and tortiously interfered with them in the manner set forth above. Defendants used dishonest, unfair and improper means as set forth above, and such means caused substantial injury to Yoomi's relationships.

117.     The defendants knowingly, intentionally and unjustifiably interfered with Yoomi's economic advantages and relations.

118.     As a result of the defendants' interference, Yoomi has suffered substantial damages as hereinbefore alleged and demands compensation therefor.

## COUNT VIII
## BREACH OF WARRANTY

119.     Yoomi realleges and incorporates by reference all paragraphs above as if specifically set forth herein.

120.     Each defendant breached their warranties that the sanitizer product would be of good quality and free from material defects. This warranty was an express warranty by Anvyl, and it was implied by VitalPure and Feel Well.

121.     As a result of these breaches, Yoomi has suffered substantial damages as hereinbefore alleged and demands compensation therefor. Yoomi lost $2,146,466.83 in out-of-pocket payments, it has a potential liabilities of $3,160,265.80, and it lost $130,000,000 in contract damages.

## JURY CLAIM

Yoomi claims a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, YOOMI RESPECTFULLY DEMANDS THAT THIS HONORABLE COURT:

1. Enter judgment in its favor on each claim set forth above;

2. Order the defendants jointly and severally to pay to the plaintiff such damages as have been sustained in consequence of the defendants' violations of law and equity;

3. Award Yoomi its legal fees pursuant to New York General Business Law § 349 and otherwise, and its costs, interest and any statutory remedies, multiple damages, punitive damages and other relief pursuant to any state or federal law as may be available;

4. Order that Trustee Process Defendant Silicon Valley Bank hold and not dissipate those assets of Anvyl and Manzo in an amount to be determined by the Court until this matter can be fully and finally adjudicated, and then to order said Trustee Process Defendant to remit to Yoomi such assets of Anvyl or Manzo as the Court may determine just to satisfy that judgment in whole or in part;

5. Order that Trustee Process Defendant Chase Bank hold and not dissipate those assets of VitalPure in an amount to be determined by the Court until this matter can be fully and finally adjudicated, and then to order said Trustee Process Defendant to remit to Yoomi such assets of VitalPure as the Court may determine just to satisfy that judgment in whole or in part; and

6. Award any further and additional relief this Court deems just and appropriate.

Respectfully submitted,

YOOMI BABYTECH, INC.,

Plaintiff

By its attorney,

Jonathan D. Plaut
New York Bar No.: 4509212
COHAN RASNICK PLAUT LLP
One State Street, Suite 1200
Boston, MA 02109
(617) 451-3200
e-mail: jdplaut@chardonlaw.com

Date: September 24, 2020