UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

YOOMI BABYTECH, INC.,

                              Plaintiff,

        – against –

ANVYL, INC., RODNEY MANZO,
VITALPURE, LLC, FEEL WELL, LLC,
LEGACY CHEMICAL CORPORATION,
and MCTRON TECHNOLOGIES, LLC,

                              Defendants.

---

**OPINION & ORDER**

20 Civ. 7933 (ER)

---

Ramos, D.J.:

    Yoomi Babytech, Inc. ("Yoomi") brings this action against Anvyl, Inc. ("Anvyl"),
Anvyl CEO Rodney Manzo (together with Anvyl, the "Anvyl Defendants"), VitalPure,
LLC ("VitalPure"), Feel Well, LLC ("Feel Well"), Legacy Chemical Corporation
("Legacy"), and MCTRON Technologies, LLC ("MCTRON") for breach of contract and
several actions in tort, in connection with Defendants' failure to deliver hand sanitizer to
Yoomi as required.  Pending before the Court are the Anvyl Defendants' and MCTRON's
motions to dismiss Yoomi's Second Amended Complaint ("SAC").  Docs. 64, 102.  For
the reasons set forth below, both motions are GRANTED.

## I.    BACKGROUND

### A.  Factual Background

    In deciding the motions to dismiss, the Court accepts all facts alleged in the SAC
as true and construes the SAC in the light most favorable to Yoomi.

### 1.  *Yoomi and Anyvl Enter into the Hand Sanitizer Agreement*

    Yoomi is a Canadian company that produces household goods.  SAC ¶ 1, Doc. 78.
The instant action arises out of Yoomi's venture to produce consumer-use hand sanitizer

for distribution and sale at various large retailers in the United States.  *Id.* ¶ 11.  Yoomi

and its affiliates had formed relationships with several large retailers to sell its hand

sanitizer, including with Albertsons, which is the second largest grocery chain in the

United States, and with Becton, Dickinson and Company ("BD"), a medical supply

company.  *Id.* ¶¶ 12-13.  Yoomi planned to produce and deliver 120 million bottles of

hand sanitizer per year, at a rate of five million bottles of 8-ounce hand sanitizer and five

million bottles of 16-ounce hand sanitizer per month.  *Id.* ¶¶ 14, 16.  Yoomi sought a

supply chain company that could manage the production and delivery of its large volume

of hand sanitizer.  *Id.* ¶ 14.

Yoomi approached Anvyl, a supply chain and production company.  Yoomi

discussed the scope and requirements of the venture with Manzo and made it clear to him

that quality, timeliness, and reliability of supply were essential to Yoomi.  *Id.* ¶¶ 16-17.

Yoomi informed Manzo that it would require a warranty that the hand sanitizer be free

from material defects and conform with FDA certifications and specifications, and that

failure to deliver the expected product on time would result in cancellation of future

orders.  *Id.* ¶¶ 15-19.  Manzo represented to Yoomi that Anvyl could meet its needs and

"was very experienced as a high-quality turnkey supply chain supplier."  *Id.* ¶¶ 19-21.

Manzo assured Yoomi that Anyvl could handle the entire supply chain process from

sourcing and production to shipment, and that it could warrant that the product would be

free from defects and meet all FDA requirements.  *Id.*

On May 10, 2020, in reliance on these representations, Yoomi and Anvyl entered

into a Hand Sanitizer Gel 70% Alcohol Supply Agreement (the "Agreement").  *Id.* ¶ 22.

In relevant part, the Agreement provided that "[Anvyl] agrees that a reliable ongoing

supply of Products is of critical importance to [Yoomi]. . . .  In the event that [Anvyl]

fails to fill any [Yoomi] orders, such failure shall constitute a material breach of this

Agreement unless [Anvyl] cures such breach . . . within fifteen (15) days."  Doc. 66-2,

¶ 4.  The Agreement also included a Limited Warranty, stating that Anvyl warranted that the hand sanitizer would be free from defects and would conform to FDA and other applicable regulatory requirements.  *Id.* ¶ 9.

Schedule A of the Agreement consisted of mockups of the product, including an image of what the product, bottles, and labels were to look like, and the unit price for the 8- and 16-ounce bottles.  *Id.* at 8.  The mockups depicted bottles with Yoomi labels for hand sanitizer gel, with a clear substance inside the bottles.  *Id*; *see also* SAC ¶ 24.

Finally, the Agreement contained a merger clause, which stated:

> The parties intend that this agreement, together with all attachments, schedules, exhibits, and other documents that are both referenced in this agreement and refer to this agreement,
> - represent the final expression of the parties' intent relating to the subject matter of this agreement,
> - contain all the terms the parties agreed to relating to the subject matter, and
> - replace all of the parties' previous discussion, understandings, and agreements relating to the subject matter of this agreement.

Doc. 66-2, ¶ 14.  The Agreement provided that New York law would govern any dispute between the parties, and that the parties consented to jurisdiction in New York over any matter arising out of the Agreement.  *Id.*

## 2. Failure of the Albertsons and BD Orders

In approximately May 2020,[1] Albertsons placed its first purchase order for 1,032,192 16-ounce bottles of hand sanitizer—an amount capable of filling twenty-eight trucks.  SAC ¶ 25.  BD then placed its first purchase order, for 35,328 16-ounce bottles.  *Id.* ¶ 26.  Yoomi provided Anvyl with both the Albertsons and BD purchase orders and paid Anvyl $2,146,466.83 pursuant to the terms of the Agreement.  *Id.* ¶¶ 25-27.  Yoomi anticipated a profit of $1,321,206 from the Albertsons order alone.  *Id.* ¶ 25.

---

[1] The SAC does not specify the date of either the Albertsons or BD purchase orders.

On May 15, 2020, Anvyl informed Yoomi that it intended to switch the bottling facility for the sanitizer to VitalPure, a subsidiary of Feel Well.[2]  *Id.* ¶ 28.  VitalPure is a Utah LLC with its principal place of business in Texas.  *Id.* ¶ 4.  Feel Well, which produced the sanitizer, is also a Utah LLC.  *Id.* ¶¶ 5, 28.  VitalPure sources its polymer, a key ingredient in the sanitizer, from Legacy, a Louisiana corporation with offices throughout the United States.  *Id.* ¶¶ 6, 30.  Legacy in turn obtains the polymer from MCTRON, a North Carolina LLC, with its principal place of business in South Carolina.  *Id.* ¶¶ 7, 30.  Prior to the switch, Anvyl assured Yoomi that VitalPure and Feel Well had worked with large customers, including Home Depot, and e-mailed Yoomi a picture of what the final product would look like.  *Id*. ¶¶ 29-30.  Yoomi approved the change in reliance on Anvyl's expertise in supply side management, as well as its recommendations of VitalPure and Feel Well.  *Id.* ¶¶ 29-32.

Ultimately, Yoomi could not deliver on the Albertsons order, for several reasons. Anvyl failed to order the correct labels, bottle caps, or trays for the product and failed to timely hire an FDA consultant to obtain a National Drug Code number and register the product with the FDA.  *Id.* ¶¶ 34-37.  These failures delayed production.  *Id.*  VitalPure's manufacturing of the sanitizer itself was also beset by problems.  VitalPure understaffed the project, and the sanitizer formula was too thick to flow through VitalPure's filling nozzles.  *Id.* ¶¶ 38-39.  VitalPure packed only twenty-four bottles of sanitizer per box, when the Albertsons order required thirty-two bottles per box.  *Id.* ¶ 40.  As a result, VitalPure and Anvyl failed to meet the shipping deadline of May 28, 2020, and then failed to meet an extended deadline, resulting in late delivery to Albertsons.  *Id.*  ¶¶ 41-42.  At some time after the expected delivery date,[3] Albertsons ultimately received the

---

[2] The SAC does not specify what bottling facility Anvyl used prior to VitalPure.

[3] The SAC does not specify the original deadline for delivery to Albertsons, nor the date that Albertsons actually received the product.

product at five of its major distribution centers and delivered them to most or all of its 2,200 stores.  *Id.* ¶ 42.

On June 2, 2020, Yoomi informed Anvyl that it anticipated three more major purchase orders:  an order for over three million bottles from Staples, and additional orders from 7-Eleven and Lowes.  *Id.* ¶ 43.  Anvyl assured Yoomi it would be able to meet the production requirements for future purchase orders and apologized for the delays with the Albertsons order, stating "I am confident we can easily produce 4-5 million units/month," and that Anyvl had access to multiple production sites in addition to the Texas plants. [4]  *Id.*

At some point after Albertsons received the delivery,[5] it found that a large number of the bottles contained sanitizer that was not clear, but instead "of a sickly yellow color," varying from light to dark yellow, with "a strange odor."  *Id.* ¶ 44.  Albertsons had all of its 2,200 stores remove the yellowed product, which amounted to 212,113 bottles.  *Id.* ¶ 47.  Albertsons also recalled and rejected 324,352 bottles of product that had not yet been distributed to its stores.  *Id.*  All bottles of yellow sanitizer had to be discarded, and the remaining bottles had to be coded, re-boxed, and re-inspected, at a total loss to Yoomi of $2,038,567:  $806,029.40 to recall the order and $1,232,537.60 for the lost value of the bottles returned by Albertsons.  *Id.* ¶¶ 47-48.  Although Yoomi brought the problem with the Albertsons order to Anvyl's attention, Anvyl took no action to resolve the issue with the yellow sanitizer.  *Id.* ¶ 49.  Albertsons then canceled the final eight truck deliveries outstanding under the purchase order, for 294,912 bottles, at a loss in sales to Yoomi of $1,120,666.  *Id.* ¶ 50.  Albertsons cancelled all future purchase orders from Yoomi and refused to order further products from Yoomi.  *Id.* ¶ 51.

---

[4] The SAC does not identify the speaker of these statements.

[5] The SAC does not specify when Albertsons discovered that a large portion of the bottles were defective, nor when Albertsons informed Yoomi of those defects.

On June 29, 2020, after inspecting the recalled bottles, VitalPure agreed that the sanitizer had turned yellow. *Id.* ¶ 45. The sanitizer turned yellow because of a design or manufacturing defect caused by itself, Feel Well, Legacy, or MCTRON. *Id.* ¶ 54.

In light of the many problems with the Albertsons order, Anvyl switched the production of the hand sanitizer again to Fareva USA, Inc. ("Fareva"), a facility in Illinois. *Id.* ¶ 56. On May 22, 2020, Yoomi entered into a Letter of Intent with Fareva for production of a minimum of three million 8-ounce bottles of hand sanitizer through July 31, 2020, plus $1,060,265.80 in costs for materials. *Id.* ¶ 69. However, further production was also beset with problems. Anvyl changed the formula for the sanitizer, requiring an updated label, but failed to source labels, bottles, and caps. *Id.* ¶ 57. As a result, Yoomi had to source its own labels, and all 35,328 bottles were delivered late to BD. *Id.* ¶¶ 57-58. BD then cancelled all future purchase orders from Yoomi. *Id.* ¶ 59.

After Yoomi lost these two major customers, its business brokers refused to continue working with Yoomi. *Id.* ¶ 60. Yoomi lost the anticipated purchase orders from Lowes, 7-Eleven, and Staples. *Id.* Yoomi's hand sanitizer business ended in failure. *Id.*

### 3. Yoomi's Claims

Yoomi brings claims for breach of contract against all parties for damages in the amount of $130,200,000, based on expected first year sales of sixty million 8-ounce bottles at a margin of $0.89 each and sixty million 16-ounce bottles at a margin of $1.28 each. *Id.* ¶ 61. Yoomi alleges that Anvyl, VitalPure, Feel Well, Legacy, and MCTRON failed in their obligations to Yoomi by failing to produce good quality and merchantable products, failing to source items, failing to produce product on time, and more. *Id.* ¶ 62. Yoomi claims that Anvyl and Manzo led it to believe that Anvyl was competent to undertake supply chain management for the venture, and that VitalPure was a competent production facility that had previously produced successfully for large buyers, together with Feel Well. *Id.* ¶¶ 62-65. Anvyl made these representations to Yoomi through

Manzo's statements on May 4 and 8, 2020, made via telephone, and through employee Will Davis' statements recommending VitalPure, made on May 15, 2020.  *Id.* ¶ 66. VitalPure and Feel Well allegedly misrepresented their competence and capacity through statements made by their respective owners Kent A. Hoggan and Owen B. Kenney, on May 15, 2020, and on subsequent dates in May and June, 2020, and through accepting Yoomi's purchase orders and money.  *Id.* ¶ 67.  Yoomi further alleges that Defendants should be required to pay the $3,160,265.80 for costs of production and supplies that it owes Fareva, based on the Letter of Intent, because it was due to Defendants' failure that Yoomi lost its purchase orders.  *Id.* ¶ 69.  Yoomi alleges that it relied on the Anvyl Defendants' and VitalPure's representations of their competence to produce the hand sanitizer, and if either Anvyl or Vital Pure "had been honest with Yoomi," they would have informed Yoomi that they were incapable of producing the required hand sanitizer. *Id.* ¶ 70.

Yoomi brings claims for breach of contract and implied covenants of good faith and fair dealing against Anvyl, VitalPure, Feel Well, Legacy, and MCTRON; for negligence, gross negligence, and negligent misrepresentation against all Defendants; for fraud and fraud in the inducement against Anvyl, Manzo, VitalPure, and Feel Well; for tortious interference with prospective economic advantage against all Defendants; for product liability (defective design and defective manufacturing claims) against Anvyl, VitalPure, Feel Well, MCTRON, and Legacy; for breach of express warranty against Anvyl; and for breach of implied warranty against Anvyl, VitalPure, Feel Well, Legacy, and MCTRON.  *Id.* ¶¶ 77-155.  Yoomi also seeks legal fees pursuant to New York General Business Law (G.B.L.) § 349, as well as punitive damages.

### B.  Procedural History

Yoomi filed this action on September 25, 2020 against the Anvyl Defendants, VitalPure, and Feel Well, and against SVB Financial Group and JPMorgan Chase Bank,

N.A. ("Chase") as Trustee Defendants.  Doc. 7.  On October 8, 2020, Yoomi filed its First Amended Complaint ("FAC").  Doc. 9.  On December 17, 2020, Yoomi dismissed its claims against SVB Financial Group, Doc. 57, and on December 28, 2020, it dismissed its claims against Chase, Doc. 61.

On January 4, 2021, Legacy answered Yoomi's FAC and brought cross-claims against the Anvyl Defendants.  Doc. 63.  On January 11, 2021, the Anvyl Defendants moved to dismiss Yoomi's tort claims as duplicative of its breach of contract claims, Doc. 64, but did not seek to dismiss the breach of contract and express and implied warranty claims.  The Anvyl Defendants also moved to dismiss Yoomi's prayer for legal fees and punitive damages under New York law.  On February 3, 2021, Legacy requested to withdraw its cross-claims against the Anvyl Defendants, which request the Court approved the next day.  Doc. 72.

On March 9, 2021, with the Court's leave, Yoomi filed its SAC, adding MCTRON as a defendant.  Doc. 78.  On June 12, 2021, MCTRON moved to dismiss the SAC for lack of personal jurisdiction and failure to state a claim.  Doc. 102.  To date, VitalPure and Feel Well have not appeared in this action.

## II.   LEGAL STANDARD

### A.   Motion to Dismiss Under Rule 12(b)(2)

"A plaintiff opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction has the burden of establishing that the court has jurisdiction over the defendant."  *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02 Civ. 4695 (LTS) (HBP), 2003 WL 21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).  To meet this burden where there has been no discovery or evidentiary hearing, the plaintiff must plead facts sufficient for a *prima facie* showing of jurisdiction.  *Id.*; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015).  As the Court

evaluates a Rule 12(b)(2) motion, it must construe all of the plaintiff's allegations as true and resolve all doubts in its favor. *Casville Invs., Ltd. v. Kates*, No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)). "However, a plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would 'lack the factual specificity necessary to confer jurisdiction.'" *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)). As Rule 12(b)(2) motions are "inherently . . . matter[s] requiring the resolution of factual issues outside of the pleadings," courts may rely on additional materials outside the pleadings when ruling on such motions. *John Hancock Prop. & Cas. Ins. Co. v. Universale Reinsurance Co.*, No. 91 Civ. 3644 (CES), 1992 WL 26765, at *1 n.1 (S.D.N.Y. Feb. 5, 1992); *accord Darby Trading Inc. v. Shell Int'l Trading and Shipping Co.*, 568 F. Supp. 2d 329, 334 (S.D.N.Y. 2008).

### B.  Motion to Dismiss Rule Under 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citations omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

9

The question in a Rule 12(b)(6) motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of plaintiffs' claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. N.Y.C.*, 458 F.3d 150, 155 (2d Cir. 2006)). Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated into it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks and citations omitted).

**C.  Heighted Pleading Standard Under Rule 9(b)**

Beyond the requirements of Rule 12(b)(6), a complaint alleging fraud must satisfy the heightened pleading requirements of the Federal Rule of Civil Procedure 9(b) by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319–20 (2007)). Specifically, Rule 9(b) requires a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *DiMuro v. Clinique Laboratories, LLC*, 572 F. App'x. 27, 30 (2d Cir. 2014) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). Put another way, Rule 9(b)

"requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *U.S. ex rel. Kester v. Novartis Pharm. Corp.,* 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014) (citations omitted).

## III.    DISCUSSION

### A.  Personal Jurisdiction over MCTRON

The Court begins with an analysis of personal jurisdiction as to defendant MCTRON.  In diversity or federal question cases, personal jurisdiction is determined in accordance with the law of the forum in which the federal court sits. *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (citing *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir.1997)).  This determination involves a two-step analysis. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996). In New York, the Court must first determine whether personal jurisdiction is appropriate pursuant to the State's general jurisdiction statute, Civil Practice Law and Rules ("C.P.L.R.") § 301, or its long-arm jurisdiction statute, C.P.L.R. § 302(a).  If the Court's exercise of personal jurisdiction is deemed appropriate according to New York law, the second step is an evaluation of whether the Court's exercise of personal jurisdiction comports with the Fifth Amendment Due Process Clause of the United States Constitution. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007).

Due process requires that a defendant have "sufficient minimum contacts with the forum" to justify a court's exercise of personal jurisdiction, such that the "the assertion of personal jurisdiction over the defendant comports with traditional notions of fair play and substantial justice" under the circumstances. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (internal quotation marks and citations omitted).  In considering a defendant's contacts with the forum state under this analysis, "[t]he crucial question is whether the defendant has purposefully availed itself of the privilege of

conducting activities within the forum State, thus invoking the benefits and protections of its laws," and therefore "should reasonably anticipate being haled into court there." *Best Van Lines*, 490 F.3d at 242-43 (internal quotation marks and citations omitted).

Because Yoomi does not contest MCTRON's assertion that it is not subject to general personal jurisdiction in New York,[6] and because MCTRON is a North Carolina LLC with its principal place of business in South Carolina, SAC ¶ 7, Docs. 102-2, 102-3, 102-4, the Court need only consider the exercise of specific personal jurisdiction. MCTRON argues that it is not subject to specific personal jurisdiction in New York because the instant case does not arise out of any business transacted, nor any tortious acts committed, by MCTRON in New York.  Doc. 102-1 at 6-11.  Yoomi argues that, because MCTRON promotes itself as having a "a national and international reach," it should be subject to suit wherever its defective products have caused harm, and further argues that New York is a convenient forum for litigation considering that the transactions in this case crossed multiple state lines.  Doc. 104 at 2-4.  The Court agrees with MCTRON.

### 1.  New York's Long-Arm Statute

Under C.P.L.R. § 302(a), a court may exercise personal jurisdiction "[a]s to a cause of action arising from" the acts of any non-domiciliary who, either in person or through an agent (1) "transacts any business within the state or contracts anywhere to supply goods or services in the state;" (2) "commits a tortious act within the state . . . " (3) "commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or

---

[6] Yoomi's opposition to MCTRON's motion to dismiss does not argue that MCTRON is subject to general jurisdiction in New York.  In the SAC, Yoomi alleges without more that all defendants do business in New York, and that this action arises out of a contract between Yoomi and Anvyl that provides for jurisdiction in New York.  SAC ¶ 8.  In its opposition, Yoomi argues only that "[t]he Court can and should exercise specific personal jurisdiction over MCTRON in this case . . . ."  Doc. 104 at 1.

services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce;" or (4) "owns, uses or possesses any real property situated within the state." N.Y. C.P.L.R. § 302(a)(1)−(4) (McKinney). The "arising from" prong of section 302(a)(1) does not require a causal link, but rather requires "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former . . ." *Kiss Nail Prod., Inc. v. One Two Cosms., LLC*, No. 19-CV-536 (MKB), 2020 WL 2924614, at *5 (E.D.N.Y. Mar. 5, 2020) (internal quotation marks and citations omitted).

Yoomi has failed to sufficiently allege that MCTRON meets any of the requirements for the exercise of personal jurisdiction under New York's long-arm statute. As to C.P.L.R. §§302(a)(1) and (4), the parties do not dispute that the instant action does not arise out of MCTRON's transaction of business in New York, nor that MCTRON does not own, use, or possess any property in New York. Doc. 102-1 at 9; Doc. 104 at 1-2. Rather, in its opposition, Yoomi states that "McTron 'purposely availed' itself of transacting business in New York, and in all of the states where its products caused harm, thus invoking the benefits and protections of New York laws." Doc. 104 at 2. However, nowhere in the SAC or in its opposition does Yoomi contend that its action against MCTRON arises from MCTRON's transaction of business in New York. Instead, Yoomi repeatedly argues that MCTRON avails itself of transacting business in all states where its products end up, including New York, and thus given what MCTRON promotes as its "national and international reach," it should reasonably expect to be haled into court in any jurisdiction where products may cause harm. Doc. 104 at 2-3.

But Yoomi fails to allege any specific connection to New York or actual transaction of business in New York. Its reliance on *Pettenato v. Beacon Health Options, Inc.*, 425 F. Supp. 3d 264 (S.D.N.Y. 2019) is inapposite. That case was a Fair Labor Standards Act class action in which the court determined, based on the Supreme Court's

decision in *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017), that it lacked personal jurisdiction over out-of-state defendants who did not transact business in New York. *Pettenato*, 425 F. Supp. 3d at 278-79. In fact, MCTRON president Larry McDaniel submitted a declaration that his review of invoices from the past ten years revealed only four invoices for sales in New York. Doc. 105-1 ¶¶ 3-6. All four invoices were sent to a company Maspeth, New York, between 2015 and 2019, for amounts ranging from approximately $615 to $1,430. Doc. 105-1 ¶¶ 3-4. These sales represent "a very small and insignificant fraction of MCTRON's annual company sales," *id.* ¶ 5, and do not constitute regular transaction of business in New York. More to the point, Yoomi's instant action has nothing to do with these sales, which also did not involve the product at issue here. *Id.* ¶¶ 5-6. Furthermore, MCTRON is correct that even entering into a contract with a New York corporation (which Yoomi is not, although it made payments from New York), does not without more constitute transacting business in New York. *See MTS Logistics, Inc. v. Innovative Commodities Grp., LLC*, 442 F. Supp. 3d 738, 755 (S.D.N.Y. 2020); *Sandoval v. Abaco Club on Winding Bay*, 507 F. Supp. 2d 312, 316 (S.D.N.Y. 2007) ("Multiple district courts in this Circuit have held . . . that the mere existence of a contract with a New York corporation is not sufficient to constitute the transaction of business under § 302(a)(1) of the CPLR.") (internal quotation marks and citations omitted).

Nor do the parties seriously dispute that C.P.L.R. § 302(a)(2) applies, because even assuming that MCTRON had committed any tortious action in connection with the manufacture of the polymer, it did not manufacture or deliver it in New York, or indeed have any connection with the state of New York. As MCTRON states, "MCTRON's connection to this case began and ended with its sale of polymers to Legacy." Doc. 102-1 at 9-10. The polymer at issue was "purchased by Yoomi in New York, through Legacy in Louisiana, and was to be shipped to VitalPure in Texas." Doc. 104 at 4. MCTRON

manufactured its product in South Carolina, then shipped it to VitalPure in Utah and/or Texas, whence it was distributed to Yoomi's customers.[7]  *Id.*

For the same reasons, § 302(a)(3) does not apply to MCTRON.  Yoomi has not alleged that MCTRON committed a tortious act causing injury to persons or property in New York, nor that it does business in, derives revenue from, or otherwise should expect its actions to have consequences in New York.  Yoomi's theory of personal jurisdiction, based on its indirect purchase of the polymer from MCTRON, fails.  As MCTRON argues, the connection to New York is too tenuous.  Doc. 102-1 at 10.

Yoomi also argues that MCTRON should have expected its actions to have consequences in New York, Doc. 104 at 3, but Yoomi's reliance on *In re Methyl Tertiary Butyl Ether* in support is misplaced.  In that case, plaintiffs brought claims alleging large-scale contamination of groundwater in several states due to gasoline producers' use of the additive methyl tertiary butyl ether (MTBE).  *In re MTBE Products Liability Litig.*, 399 F. Supp. 2d 325, 327 (S.D.N.Y. 2005).  The *MTBE* court determined that New York's long-arm statute, C.P.L.R. § 302(a)(3), applied because defendant gasoline producers caused injury in New York by allegedly contaminating groundwater, and the defendants reasonably should have expected their actions to have consequences in New York, considering that their gasoline was sold to a major gasoline seller in New York and because defendants derived "substantial revenue," to the tune of billions of dollars, from interstate sales. *Id.* at 338.  Yoomi also cites *Allen v. Canadian Gen. Elec. Co.*, a 1978 case in which the Appellate Division, Third Department affirmed the New York Supreme Court's exercise of personal jurisdiction over the manufacturer of defective electric teakettles, where defendant's teakettles injured a plaintiff in New York and the court found defendant's

---

[7] In its opposition, Yoomi writes that MCTRON's products where shipped to the production facilities in Utah and/or Texas, and then "widely distributed in California."  Doc. 104 at 4.  The SAC does not specify either the locations of the five Albertsons distribution centers that received Yoomi's product or the locations of the grocery stores that received the product.  However, Albertsons is the second largest grocery chain in the country, with over 2,200 stores.  SAC ¶ 12.

revenue of $8.79 million from New York to be substantial.   65 A.D.2d 39, 42–43 (1978), *aff'd* 50 N.Y.2d 935 (1980).  Here, by contrast, MCTRON has received revenue of less than $3,000 from the state of New York over the last ten years.  Doc. 105-1.  Yoomi has not sufficiently alleged tortious acts causing injury in New York; nor has it alleged that MCTRON transacts business or derives substantial revenue in New York, or that it should have reasonably expected its polymer to cause injury in New York.

There is thus no basis for the exercise of personal jurisdiction under New York's long-arm statute.

## 2.  *Due Process*

Even assuming that New York's long-arm statute were to apply, the Court's exercise of personal jurisdiction over MCTRON would not comport with due process.  Due process demands that defendants have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (citations omitted).  "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation."  *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (internal quotation marks and citations omitted).  The due process inquiry has two parts: (1) "the court must determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction," and (2) "the court must determine whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case."  *Schottenstein v. Schottenstein*, No. 04 Civ. 5851 (SAS), 2004 WL 2534155, at *7 (S.D.N.Y. Nov. 8, 2004) (citing *Metro. Life*, 84 F.3d at 567).  Where a non-domiciliary "avails itself of the benefits of the forum, has sufficient minimum contacts with it, and should reasonably expect to defend its actions there," the Court's exercise of personal jurisdiction will not offend due process.  *Kreutter*

16

*v. McFadden Oil Corp.*, 71 N.Y.2d 460, 466 (1988).  Where the conduct at issue "occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff," courts employ an "effects test, by which the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum" and "intentionally caused . . . an effect in the forum through his conduct elsewhere."  *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, No. 13 Civ. 981 (PGG), 2015 WL 1514539, at *9 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir. 2019) (quoting *Tarsavage v. Citic Trust Co., Ltd.*, 3 F.Supp.3d 137, 145 (S.D.N.Y.2014)).

The requisite "minimum contacts" analysis "overlaps significantly" with New York's § 302(a)(1) inquiry into whether a defendant transacted business in the State. *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 515 (S.D.N.Y. 2016) (citations omitted). As noted above, the only connection to New York that Yoomi has alleged is that Yoomi paid MCTRON—via its payment to Legacy—from New York.  But in order to establish "a substantial connection with the forum State," the "relationship must arise out of contacts that the defendant himself creates with the forum State."  *Walden*, 571 U.S. at 284 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)).  That is, the "minimum contacts" analysis hinges on the defendant's own contacts with the forum State, rather than any transactions or interactions with the plaintiff or other persons residing in the forum:  the plaintiff "cannot be the only link between the defendant and the forum."  *Id.* at 285-86.  Yoomi has not established any conduct or contacts by MCTRON towards New York.  Instead, Yoomi's payments to MCTRON are the only connection to New York.

The reasonableness inquiry depends on five factors:  "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the most efficient resolution of the controversy; and (5) the interests of the state in furthering substantive social policies."  *Minnie Rose LLC*, 169 F. Supp. 3d at 515 (citing

*Schottenstein*, 2004 WL 2534155, at *8).  Here, the exercise of personal jurisdiction over MCTRON would not be reasonable.  Only the third factor—the plaintiff's interest—weighs in favor of the Court's exercise of personal jurisdiction.  The fourth factor is neutral, as Yoomi's tort claims do not survive, for the reasons discussed below.  As to the remaining factors, MCTRON will be burdened by litigating in New York, and New York does not have a particular interest in the adjudication of this case of defective hand sanitizer, when the hand sanitizer was produced in Utah, Texas, and Illinois, and delivered to grocery stores in unspecified locations.  SAC ¶¶ 4-5, 42, 56-57.  Nor would New York's substantive social policies be served through the litigation of this defective product, when Yoomi does not allege that any New York residents were harmed by the product, which in any case, Albertsons promptly recalled.[8]

Yoomi's argument that the Court should exercise personal jurisdiction over MCTRON because New York is a convenient forum for litigation is misplaced.  Convenience is not the test to determine whether a court may exercise personal jurisdiction. "Due process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties."  *Walden*, 571 U.S. at 284 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980)).  Yoomi's reliance on *Ritrama, Inc. v. Burlington Graphic Systems, Inc.*, No. 11-CV-977 SRN/AJB, 2011 WL 5374566 (D. Minn. Nov. 7, 2011) and *B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, 229 F. Supp. 2d 1209 (D. Kan. 2002), Doc. 104 at 4, is irrelevant here:  the *Ritrama* court discussed convenience to the parties in connection with venue, not jurisdiction, 2011 WL 5374566 at *5-7, and *B-S Steel* involved a claim brought under the Sherman Act, which provides for nationwide service of process of antitrust claims, 229 F. Supp. 2d at 1214-16.

---

[8] While Albertsons and BD were harmed by the delayed and defective product, the SAC does not provide any detail about either their residence or the locations where they received the product.  Even assuming Albertsons and BD to be New York residents, Yoomi cannot show that the exercise of personal jurisdiction over MCTRON is reasonable.

Because the Court plainly cannot exercise personal jurisdiction over MCTRON, the Court does not consider MCTRON's motion to dismiss under Fed. R. Civ. P. 12(b)(6).

### B.   Claims Against Anvyl Defendants

*1.   Negligence, Gross Negligence, and Products Liability*

Yoomi brings several tort claims for the same conduct, and for the same damages, as its claim for breach of contract.  As the Anvyl Defendants correctly state, New York law does not recognize tort claims premised on breach of contractual duty.

"[T]o plead a tort claim, a plaintiff must allege an independent duty that 'springs from circumstances extraneous to, and not constituting elements of, the contract.'" *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 949 F. Supp. 2d 486, 504 (S.D.N.Y. 2013) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 390 (1987)). The New York Court of Appeals has made clear that a plaintiff may not bring a tort claim duplicative of a breach of contract claim:

> A tort obligation is a duty imposed by law to avoid causing injury to others.  It is apart from and independent of promises made and therefore apart from the manifested intention of the parties to a contract . . . Thus, [a] defendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations. . . . [W]here a party is merely seeking to enforce its bargain, a tort claim will not lie.

*New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316 (1995) (internal quotation marks and citations omitted).

The parties do not dispute that a valid and enforceable contract exists.  Doc. 73 at 2.  Therefore, Yoomi may not restate its breach of contract claims as tort claims.  *See Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011) ("Although that principle [that contract claims may not be repackaged as claims sounding in fraud and other torts] does not apply where there is a bona fide dispute as to

the existence of a contract or where the contract does not cover the dispute in issue, nei-ther of those factors is present here.") (internal quotation marks and citations omitted).

In its opposition, Yoomi does not even argue that it has stated separate causes of action for negligence, gross negligence, and products liability apart from its claims for breach of contract. *See* Doc. 69 at 5-9.  Nor does Yoomi argue that there is any legal ba-sis under New York law to bring such duplicative claims. *See id*.  Instead, Yoomi fo-cuses on the Anvyl Defendants' allegedly false representations that Anvyl and its affili-ates were competent to perform the contract, Doc. 69 at 5-6,[9] which are more relevant to its claims for fraud in the inducement or negligent misrepresentation, rather than negli-gence or gross negligence.

Furthermore, the Anvyl Defendants are correct that the only injuries that Yoomi alleges in connection with its negligence, gross negligence, and products liability claims are economic loss.  SAC ¶¶ 88, 92, 131, 140.[10]  Injury is an essential element of tort ac-tions including negligence, gross negligence, and products liability.  Where, as here, a plaintiff alleges only economic loss as injury, "the usual means of redress is an action for breach of contract; a tort action for economic loss will not lie."  *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1320 (S.D.N.Y. 1997) (citations omitted).  In the context of product liability, the New York Court of Appeals has held that "no tort

---

[9] These representations include, among others, that "Manzo assured Yoomi" that Anvyl was experienced and would warrant that the hand sanitizer would be free from defects; that "Anvyl actively led Yoomi to believe" that it was competent to undertake the management of Yoomi's hand sanitizer project; and that "Anvyl falsely informed Yoomi" that VitalPure and Feel Well had worked with very large buyers such as Home Depot.  Doc. 69 at 5-6; SAC ¶ 62.

[10] *See, e.g.*, SAC ¶ 88:  "As a direct and proximate result of the defendants' negligence, Yoomi has suffered substantial damages as hereinbefore alleged and demands compensation therefor.  Yoomi lost approximately $2,146,466.83 in out-of-pocket payments, it has a potential liabilities [sic] of $3,160,265.80, and it lost $130,200,00 in contract damages.";  SAC ¶ 92:  "As a result of the defendants' gross negligence, Yoomi has suffered substantial damages as hereinbefore alleged and demands compensation therefor.  Yoomi lost approximately $2,146,466.83 in out-of-pocket payments, it has a potential liabilities of $3,160,265.80, and it lost $130,200,000 in contract damages.";  SAC ¶ 131:  "As a result, Yoomi has suffered substantial damages as hereinbefore alleged and demands compensation therefor.";  SAC ¶ 140:  "As a result, Yoomi has suffered substantial damages as hereinbefore alleged and demands compensation therefor."

recovery can be had against the manufacturer for contractually based economic loss, whether due to injury to the product itself or consequential losses flowing therefrom." *Bocre Leasing Corp v. General Motors Corp.*, 84 N.Y. 2d 685, 693 (1995). Here, the economic damages Yoomi sustained are clearly contemplated by the Agreement between Yoomi and Anvyl. *See Clark-Fitzpatrick*, 70 N.Y.2d at 389–90 (1987) ("Merely charging a breach of a 'duty of due care', employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim.")

Finally, Yoomi alleges in opposition that Manzo was personally engaged in the tortious acts and that a corporate officer may be liable in tort if they personally engaged in tortious acts, citing several New York cases. Doc. 69 at 9-10. Yoomi asserts that its claims for negligence and gross negligence against Manzo therefore survive. However, in order to assert these claims against Manzo, Yoomi would have needed to properly plead them in the first instance. Because Yoomi's claims for negligence and gross negligence are duplicative of its breach of contract claims and barred by the economic loss rule, the claims against Manzo are dismissed.

### 2. *Fraud, Fraudulent Inducement, and Negligent Misrepresentation*

Yoomi's fraud-based tort claims fail for multiple reasons: they are duplicative of Yoomi's breach of contract claims, and Yoomi has not pled the elements for any of these causes of action with the particularity required by Fed. R. Civ. P. 9(b) and 12(b)(6).

### a. *Fraud*

"To prove fraud under New York law, 'a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19-20 (2d Cir. 1996) (citing *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.

1995)).  New York law provides that "where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract . . . , the fraud claim is redundant" and the plaintiff's only remedy is for breach of contract.  *Telecom Int'l Am., Ltd. v. AT & T Corp.,* 280 F.3d 175, 196 (2d Cir. 2001) (citing *Sudul v. Computer Outsourcing Servs.,* 868 F. Supp. 59, 62 (S.D.N.Y. 1994)).  Thus, a plaintiff may not claim fraud solely on the basis that the promisor had no intention of performing its end of the contract:  "simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim." *Id.* (citations omitted); *see also Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1160 (S.D.N.Y. 1996) ("Most courts that have . . . considered the issue have held that a contract claim cannot be converted into a fraud claim by the addition of an allegation that the promisor intended not to perform when he made the promise." (collecting cases)).

To maintain a claim of fraud in a case alleging that the promisor's misrepresentations of performance induced the promisee to enter the contract—exactly what Yoomi attempts to allege here—the plaintiff must:  (1) "demonstrate a legal duty separate from the duty to perform under the contract," (2) "demonstrate a fraudulent misrepresentation collateral or extraneous to the contract," or (3) "seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."  *Bridgestone/Firestone*, 98 F.3d at 20 (internal quotation marks and citations omitted); *see also Papa's-June Music*, 921 F. Supp. at 1161.

Yoomi does not meet any of these requirements.  The entirety of Yoomi's fraud claims are based on allegations that the Anvyl Defendants, along with VitalPure and Feel Well, represented that they were competent to perform the contract and had successfully completed projects of similar scope before, when in fact they were not competent and the

project therefore failed.[11]  As to the first factor, Yoomi has not alleged any independent duty on the part of any of the Defendants beyond their duty to perform under the contract. As to the second, Yoomi in its opposition argues that its statements that Anvyl and Manzo assured Yoomi of their capabilities "despite knowing they were not equipped" to manage the project; that they "falsely and misleadingly vouched for and recommended business affiliates"; and that they led Yoomi to believe they had worked with these affiliates in the past when that was not the case, are enough to state misrepresentations of material fact that are collateral to the contract.  Doc. 69 at 14.  They are not.  Courts in this Circuit, applying New York law, routinely dismiss fraud claims based on a promisor's statements that they intended to or were capable of performing under a contract as duplicative of breach of contract claims.  *See, e.g.*, *Bridgestone/Firestone*, 98 F.3d at 19-20 (affirming dismissal of a fraud claim based on "intentionally-false statements . . . indicating [] intent to perform under the contract" as insufficient as a matter of New York law); *Telecom Int'l*, 280 F.3d at 196 (affirming dismissal of fraud claims brought based on AT&T representative's statement that the company "had experience with systems 'similar'" to those required by plaintiff); *Verus Pharms., Inc. v. Astrazeneca AB*, No. 09 Civ. 5660 (BSJ), 2010 WL 3238965, at *11 n.12 (S.D.N.Y. Aug. 16, 2010), *aff'd*, 427 F. App'x 49 (2d Cir. 2011) (dismissing fraud claims where "purportedly fraudulent

---

[11] *See, e.g.*, SAC ¶ 101:  "Anvyl and Manzo made the false statements and representations that Anvyl was competent to undertake the supply chain management of the annual 120,000,000 bottle production project, when they knew or should have known that Anvyl simply was not.  They knew or should have known that Anvyl was not because Anvyl was so completely incompetent to undertake this large task that it could not have been unknown to them."; SAC ¶106:  "VitalPure led Yoomi to believe that it was competent to undertake the production . . . when it knew or should have known that it was not as it failed in nearly every material respect. . . VitalPure concealed that material fact from Yoomi."; SAC ¶ 109:  "Feel Well led Yoomi to believe that it was competent to produce the sanitizer in a good, salable and commercially marketable way, when it knew or should have known that it was not as it failed to deliver colorless sanitizer as Yoomi required.  Feel Well and [Feel Well manager Kent] Hoggan concealed that material existing fact from Yoomi."

representations all relate to Defendants' intent and ability to perform those contractual obligations.").

Finally, Yoomi relies on *Lam v. Am. Exp. Co.*, 265 F. Supp. 2d 225 (S.D.N.Y. 2003) and *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954 (1986), to argue that it has in fact asserted special damages that are not recoverable in contract, and therefore its fraud claims should proceed.  Doc. 69 at 14-15.  Specifically, Yoomi alleges that because it was required to pay Fareva $3,160,265.80 for production and material costs under a separate Letter of Intent, *id.* at 15, it has adequately stated damages apart from its contract damages.  However, both *Lam* and *Deerfield* involved claims for damages caused by misrepresentations collateral to the plaintiffs' contract claims.  *See Lam*, 265 F. Supp. 2d at 232 (determining that plaintiff could pursue his claim for fraudulent inducement for damages for the severance benefits that he waived based on defendant's untrue representations about his employment contract, which he would be unable to recover as contract damages); *Deerfield*, 68 N.Y.2d at 956 (holding that there was no duplication of damages in a claim for fraudulent inducement based on material misrepresentations that were collateral to the contract and were inducement for promisee to enter the contract).  Here, by contrast, Yoomi has not alleged any misrepresentations collateral to the contract.  Nor has Yoomi pleaded that the amount of money it owes to Fareva is separate and unrecoverable as contract damages:  in fact, it has pleaded that it should receive the same $3,160,265.80 in contract damages.  SAC ¶ 83.

Yoomi's fraud-based claims also fail for the independent reason that they are not pleaded with the particularity required under Rule 9(b).  To bring actions sounding in fraud, "[t]he Complaint must . . . state with particularity the circumstances of the fraud under Rule 9(b) and contain sufficient facts, accepted as true, to state claims for relief for common-law fraud that are facially plausible under Rule 8(a)(2)."  *Minnie Rose*, 169 F. Supp. 3d at 516 (citing *Woori Bank v. RBS Sec., Inc.,* 910 F. Supp. 697, 700-01 (S.D.N.Y. 2012).  Under the enhanced pleading standards of Rule 9(b), plaintiffs "must

not only allege that the content is false, but 'they must demonstrate with specificity why and how that is so.'" *Travelex Currency Servs., Inc. v. Puente Enterprises, Inc.*, 449 F. Supp. 3d 385, 395 (S.D.N.Y. 2020) (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

Yoomi's fraud claims against all Defendants fail because Yoomi does not allege how any statements they made were false, beyond the circular logic that Defendants' representations that they could perform under the contract were false, because the hand sanitizer project ultimately failed.  Yoomi has also failed to allege any scienter or intent to defraud against any of the Defendants.  While the Rule 9(b) requirements do not apply to the elements of scienter, "[t]he simple fact of later non-performance is insufficient to raise a strong inference that [a defendant] acted with an intent to defraud." *Of a Feather, LLC v. Allegro Credit Servs., LLC*, Nos. 19 Civ. 9351 (DLC), 20 Civ. 2622 (DLC), 2020 WL 3972752, at *6 (S.D.N.Y. July 14, 2020).

### b.   *Fraudulent Inducement*

Under New York law, claims for fraudulent inducement require a plaintiff to prove five elements:  "(1) a material misrepresentation or omission of fact, (2) made by defendant with knowledge of its falsity (3) and an intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Hindsight Sols., LLC v. Citigroup Inc.*, 53 F. Supp. 3d 747, 772 (S.D.N.Y. 2014) (citations omitted). "[F]raudulent inducement involves a misrepresentation of present fact, not of future intent, collateral to a contract and used to induce the defrauded party to sign the contract." *Bruce v. Martin*, Nos. 87 Civ. 7737 (RWS), 90 Civ. 0870 (RWS), 90 Civ. 4651 (RWS), 1993 WL 148904, at *5 (S.D.N.Y. Apr. 30, 1993) (internal quotation marks and citations omitted).  For the same reasons above, Yoomi has not articulated any misrepresentations of present fact collateral to the contract, nor any intent to defraud on the part of any of the Defendants.

c. *Negligent Misrepresentation*

Under New York law, a claim for negligent misrepresentation must show "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Marc J. Bern & Partners LLP v. U.S. Legal Support, Inc.*, No. 17 Civ. 6771 (ER), 2018 WL 2943784, at *6 (S.D.N.Y. June 11, 2018) (citing *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007)). "A special relationship may be established by 'persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011) (quoting *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996)). "[G]enerally, a special relationship does not arise out of an ordinary arm's length business transaction between two parties." *Marc J. Bern*, 2018 WL 2943784 at *6 (quoting *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 296-97 (2011)). Because negligent misrepresent sounds in fraud, it is subject to Rule 9(b)'s heightened pleading standard. *See, e.g.*, *Woori Bank*, 910 F. Supp. 2d at 705; *Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ. 4770 (SAS), 2003 WL 1858153, at *4 (S.D.N.Y. Apr. 10, 2003).

Yoomi's negligent misrepresentation claims fail at the outset because Yoomi has not even attempted to plead any special relationship between itself and any of the Defendants. In opposition, Yoomi argues that its claims for negligent misrepresentation should proceed because a "jury may find that these false assurances give rise to a special relationship between Yoomi and Anvyl." Doc. 69 at 15. That is not enough. Yoomi's negligent misrepresentation claim is dismissed as to all Defendants.

26

### 3. Tortious Interference with Prospective Economic Advantage

Under New York law, in order to prevail on a claim for tortious interference with prospective economic advantage, a plaintiff "must show that '(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.'" *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (quoting *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)).  New York courts have rejected claims containing "only a general allegation of interference with customers without any sufficiently particular allegation of interference with a specific contract or business relationship." *Id.* at 262 (citing *McGill v. Parker,* 179 A.D.2d 98, 105 (1992)).  Furthermore, New York courts have generally held that the defendant's wrongful conduct must "amount[] to a crime or an independent tort," *id.* (citing *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 190 (2004)), although other courts have held that "such acts are not essential to find wrongful means." *Catskill Dev.,* 547 F.3d at 132 (citing *Hannex Corp. v. GMI, Inc.,* 140 F.3d 194, 206 (2d Cir.1998)).  The wrongful conduct must be directed "at the party with which the plaintiff has or seeks to have a relationship," rather than at the plaintiff. *Armored Grp., LLC v. Homeland Sec. Strategies, Inc.*, No. 07 Civ. 9694 (LAP), 2009 WL 1110783, at *2 (S.D.N.Y. Apr. 21, 2009) (citing *Carvel*, 3 N.Y.3d at 192)).

The Anvyl Defendants are correct that Yoomi has failed to allege any tortious action directed at a third party.  Doc. 65 at 18.  In opposition, Yoomi states only, once again, that Anvyl interfered with Yoomi's relationship with Albertsons, BD, Yoomi's business brokers, and "investors and potential customers," including 7-Eleven, Staples, and Lowes.  Doc. 69 at 17-18.  However, nowhere in the SAC does Yoomi allege any action specifically targeting these third parties:  instead, Yoomi's SAC repeats that the Anvyl Defendants, and the other defendants, did not comply with their contractual duties.  Courts routinely dismiss claims alleging tortious interference with economic prospects in

cases similar to the facts here. *See, e.g.*, *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995) (affirming dismissal of claim for tortious interference with prospective economic advantage for failure to "allege such intentional interference."); *Armored Grp.*, 2009 WL 1110783, at *2 (dismissing plaintiff's claim for tortious interference for failure to allege any wrongful means or violation of any duty independent of the contract); *Watson v. Riptide Worldwide, Inc.*, No. 11 CIV. 0874 PAC, 2012 WL 383946, at *7 (S.D.N.Y. Feb. 7, 2012) (dismissing claims for tortious interference as "fall[ing] short of the level of culpability required to state a claim for tortious interference with prospective economic advantage."); *Krinos Foods, Inc. v. Vintage Food Corp.*, 30 A.D.3d 332, 333 (2006) (finding plaintiff's allegation that defendant interfered with business relationships insufficient because it failed to show that defendant used wrongful means).

Yoomi's claim for tortious interference with prospective economic advantage is therefore dismissed as to all Defendants.

### 4. Fees Under N.Y. G.B.L. § 349 and Punitive Damages

New York G.B.L. § 349 "makes unlawful deceptive acts or practices in conducting a business or furnishing a service." *New York Univ.*, 87 N.Y.2d at 320. A person injured by a violation of G.B.L. § 349 may bring an action to recover actual damages or fifty dollars, whichever is greater, and a court may triple the damages to a maximum of $1,000 and award attorneys' fees. *Id.* (citing G.B.L. § 349(h)). In order to bring a claim under G.B.L. § 349, a plaintiff must, as a threshold matter, "charge conduct that is consumer oriented." *Id.* (citing *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 N.Y.2d 20 (1995)). As the New York Court of Appeals explained, "[t]he conduct need not be repetitive or recurring but defendant's acts or practices must have a broad impact on consumers at large; [p]rivate contract disputes unique to the parties . . . would not fall within the ambit of the statute." *New York Univ.*, 87 N.Y. 2d at 320 (internal quotation marks and citations omitted).

As the Anvyl Defendants point out, nowhere in Yoomi's SAC has Yoomi actually pleaded a violation of G.B.L. § 349.  In opposition, Yoomi argues that defendants' conduct had a "far-reaching consumer impact" in that "millions of bottles of substandard, yellowed and unsalable consumer-use hand sanitizer [were] distributed across the country."  Doc. 69 at 19.  But the SAC states on its face that the bottles of yellow hand sanitizer were recalled, and future purchase orders canceled.  ¶¶ 47, 50.  Yoomi does not allege that any of the defective hand sanitizer actually reached any consumers.  Even in its opposition, Yoomi admits that the bottles were "unsalable."  Yoomi has therefore not alleged the prerequisite harm to the public at large contemplated by the statute.  *Barroso v. Polymer Rsch. Corp. of Am.*, 80 F. Supp. 39, 42-43 (E.D.N.Y. 1999) (dismissing plaintiff's claim under G.B.L. § 349 where plaintiff had not alleged injury to the public at large and rejecting plaintiff's argument that its claim that defendants had a pattern of targeting manufacturers with false and misleading advertising was sufficient).  Thus, Yoomi's prayer for legal fees under G.B.L. § 349 is dismissed with prejudice.

"[U]nder New York law, punitive damages are not a separate cause of action," but instead are "inextricably linked to the underlying cause of action."  *Greenbaum v. Svenska Handelsbanken, N.Y.*, 979 F. Supp. 973, 982 (S.D.N.Y. 1997), *on reconsideration sub nom. Greenbaum v. Handelsbanken*, 26 F. Supp. 2d 649 (S.D.N.Y. 1998).  The purpose beyond punitive damages is "not to compensate the injured party but rather to punish the tortfeasor and to deter this wrongdoer and others similarly situated" from such future conduct.  *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489 (2007).  Punitive damages are "refused in the ordinary fraud and deceit case."  *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961) (internal quotation marks and citations omitted).

The New York Court of Appeals has held that, in order to recover punitive damages for breach of contract involving fraud, a plaintiff must establish that a defendant's conduct:  (1) is actionable as an independent tort; (2) was sufficiently egregious; and (3) was directed not only against the plaintiff, but was part of a pattern of behavior aimed at

the public generally.  *Rocanova v. Equitable Life Assur. Soc'y of U.S.*, 83 N.Y.2d 603, 613 (1994); *see also Schonfeld v. Hilliard*, 218 F.3d 164, 183-84 (2d Cir. 2000).  For the reasons stated above, Yoomi has not met any of these elements.  Yoomi's prayer for punitive damages is therefore dismissed with prejudice.

### C.  Leave to Amend

In its opposition, Yoomi requests leave to correct references to "contract damages" in connection with Yoomi's tort claims in the SAC.  Doc. 69 at 9.  That request is denied as moot, because Yoomi's tort claims are dismissed with prejudice.

While Yoomi has not specifically requested leave to amend, any further leave to amend will be denied as any effort to replead Yoomi's tort claims would be futile.  Motions to amend are ultimately within the discretion of the district court judge, *Foman v. Davis*, 371 U.S. 178, 182 (1962), who may deny leave to amend for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (citation omitted).  An amendment to a pleading is futile if the proposed claim would not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citation omitted).  Amendment is futile when it is "beyond doubt that the plaintiff can prove no set of facts in support of his amended claims."  *Pangburn v. Culbertson*, 200 F.3d 65, 70-71 (2d Cir. 1999) (internal quotation marks and citation omitted).  Following this standard, courts accept the plaintiff's factual allegations as true and draw reasonable inferences in favor of the plaintiff.  *Dougherty*, 282 F.3d at 87.

Because the Court plainly does not exercise personal jurisdiction over MCTRON, Yoomi may not replead its claims against MCTRON.  Furthermore, as regards the Anvyl Defendants' motion to dismiss, Yoomi had the benefit of the Anvyl Defendants' moving papers and reply papers being filed nearly two months in advance of the date when Yoomi

filed its SAC.  *See* Docs. 64, 65, 66, 78.  Yoomi had ample time to correct any deficiencies in its FAC.  Yoomi made little effort to do so:  the primary substantive difference between the FAC and the SAC is that Yoomi dismissed its claims against SVB Financial Group and Chase and added MCTRON as a defendant.  *Compare* Doc. 9 *with* 78.  Therefore, Yoomi's tort claims against all Defendants and all claims against MCTRON are dismissed with prejudice.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are GRANTED. MCTRON is dismissed as a party to this matter.  Rodney Manzo is also dismissed as an individual defendant.  Yoomi's surviving claims are:  (1) breach of contract and implied covenants of good faith and fair dealing against Anvyl, VitalPure, Feel Well, and Legacy; (2) breach of express warranty against Anvyl; and (3) breach of implied warranty against Anvyl, VitalPure, Feel Well, and Legacy.  The Anvyl Defendants' request for oral argument is DENIED as moot.

The remaining parties are directed to appear for an initial conference on October 13, 2021 at 4:30 pm.  The parties are directed to dial (877) 411-9748 and enter access code 3029857# at that time.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 64, 74, and 102, and to terminate MCTRON and Manzo as defendants in this action.

It is SO ORDERED.

Dated:     September 22, 2021
           New York, New York

_____
           Edgardo Ramos, U.S.D.J.